**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

| | |
|---|---|
| ANNELISE T. OSBORNE | : |
| | :     Index No.: |
| Plaintiff, | : |
| | : |
| | : |
| v. | :     **COMPLAINT** |
| | : |
| MOODY'S INVESTORS SERVICE, INC. and | : |
| NICK LEVIDY, in his official and individual | : |
| capacities, | :     **JURY TRIAL DEMANDED** |
| | : |
| Defendants. | : |

---------------------------------------------------------------X

Plaintiff Annelise T. Osborne ("Ms. Osborne" or "Plaintiff"), by and through her

undersigned counsel, Wigdor LLP, as and for her Complaint in this action against Defendants

Moody's Investors Service Inc., ("Moody's" or the "Company") and Nick Levidy ("Mr.

Levidy") (together with Moody's, "Defendants"), hereby states and alleges as follows:

**PRELIMINARY STATEMENT**

1.      Despite Moody's promoting itself to potential employees as a company

"committed to making diversity and inclusion part of the fabric of our organization" and

specifically highlighting its dedication to supporting the "professional needs" of its "female

leadership," Ms. Osborne encountered a markedly different reality while working for the

Company, where her gender quickly became an insurmountable hurdle to her career prospects.

2.      Throughout her employment with Moody's, one of the world's leading providers

of credit ratings, the Company displayed the fact that it was no different than other companies in

the financial industry in its repeated insistence of erecting obstacles designed to prevent its

female employees, including Ms. Osborne, from obtaining the same opportunities as their male counterparts.

3.      Female employees at the Company were constantly victimized by common stereotypes about women in the workforce, ranging from their supposed lack of professional commitement after starting a family, to their being pressured not to excel in deference to the insecurities of their male counterparts, to being denied promotions while less qualified men were promoted ahead of them.  Ms. Osborne herself was denied multiple opportunities afforded to less qualified male employees on her team, a testament to the fact that the Company is concerned primarily with the career progression of its male employees, to the detriment of similar, or more highly qualified, female employees.

4.      Most troublingly, when Ms. Osborne brought significant violations of the Securities Exchange Commission ("SEC") rules to the attention of the Company, she was dismissed as having  voiced merely "petty concern[s];" a clear indication that the Company views its female employees as fitting the prevailing stereotype of  the oversensitive woman being disposed to melodrama.

5.      Indeed, rather than praising Ms. Osborne for uncovering fraud and bringing it to the Company's attention, she was instead subjected to a steadily increasing pattern of retaliation, including for her ongoing complaints about gender discrimination, culminating with the unlawful termination of her employment.

## NATURE OF THE CLAIMS

6.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress unlawful employment practices committed by Defendants against Ms. Osborne, including Defendants' discriminatory treatment towards, and harassment of, Ms.

Osborne due to her gender, and unlawful retaliation committed against Ms. Osborne due to her complaints of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq.* ("NYCHRL"), as well as damages arising from Defendants' unlawful termination of Ms. Osborne's employment in retaliation for her protected whistleblower activities in violation of Section 806 of the  Sarbanes-Oxley Act 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act" or "SOX").

## ADMINISTRATIVE PROCEDURES

7.      On March 4, 2016 Plaintiff filed a Complaint with the Occupational Safety & Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the "whistleblower" provisions of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (hereinafter, the "Administrative Complaint").

8.      OSHA acknowledged receipt of the Plaintiff's whistleblower complaint by letter dated March 29, 2016.

9.      On February 1, 2017, Plaintiff received a notice from OSHA dismissing her claims and allowing her to "bring a *de novo* action in United States District Court."

10.      On March 7, 2016 Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (" EEOC"), alleging violations of Title VII.

11.      This complaint has been filed within 90 days of Ms. Osborne's receipt of the Notice of Right to Sue from the EEOC.

12.      Following commencement of this action, a copy of this Complaint will be served on both the New York City Commission on Human Rights and the Office of the Corporation

Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

13.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under SOX and Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant Moody's Investors Service Inc.'s principal place of business is located within the Southern District of New York, and all of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

16.     Plaintiff Annelise Osborne is a female former Senior Vice President of Moody's Investors Service Inc.  At all relevant times, Ms. Osborne met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

17.     Defendant Moody's Investors Service, Inc., is an international leader in credit ratings, research and risk analysis, with offices in 36 countries worldwide.  The Company is a member of Moody's Corporation.  It has a principal office located at 7 World Trade Center at 250 Greenwich Street, New York, NY 10007.  At all relevant times Defendant Moody's Investors Service, Inc. met the definition of "employer" and/or "covered employer" under all relevant statutes.

18.     As a publically held corporation, Moody's issues multiple classes of securities required to be registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

19.     Defendant Nick Levidy is, upon information and belief, a resident of the State of New York.  Mr. Levidy was and is a Managing Director for Structured Finance at Moody's Research Division.  At all relevant times, Mr. Levidy had supervisory authority over Ms. Osborne, and had the power to investigate, discover, or terminate misconduct as alleged herein and otherwise covered by the provisions of 18 U.S.C. § 1514A.  In this position, Mr. Levidy was a direct participant in the discriminatory policies and practices to which Ms. Osborne was subjected.  At all relevant times Defendant Levidy met the definition of "employer" and/or "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**Background**

20.     On or about January 2004, Ms. Osborne was hired by Moody's as an Associate Analyst at their New York location.

21.     Ms. Osborne was consistently a top performer at Moody's, as evidenced by the fact that she received several raises and promotions throughout her tenure, including her eventual promotion to the position of Senior Vice President in the CMBS group.

22.     That Ms. Osborne was an outstanding employee is further supported by her performance reviews, which routinely rated Ms. Osborne at or near the top of her group.

23.     Indeed, Ms. Osborne was often praised for her "significant contributions" to the Company's overall success.

24.     In addition, Ms. Osborne held leadership positions within the Company's Women's Employee Relations Group, and Moody's Global Corporate Volunteer Program, demonstrating her commitment to addressing the issues facing women at Moody's and to the Company's social responsibility at large.

25.     Ms. Osborne received recognition even from outside organizations for both her contributions to Moody's and her work on behalf of other women in the finance industry, as when she was awarded the prestigious Real Estate Women of Influence award for 2014.

**The Culture and Practice of Gender Discrimination at Moody's**

26.     Despite Ms. Osborne's significant contributions to Moody's, her career at the Company was consistently marred by the unlawful gender discrimination that is sadly endemic towards women in corporate America, and within the finance industry in particular.

27.     During her two year tenure as head of the Company's Employee Resource Group for Women, Ms. Osborne was in a unique position to witness the wide-spread and institutionalized discrimination encountered by female employees at Moody's.

28.     Throughout her tenure in this position, several female colleagues, and particularly women in the Structured Finance group, conveyed to Ms. Osborne that they had faced discrimination similar to that which Ms. Osborne alleges, including being overlooked for a promotion in favor of less qualified male employees, and receiving less compensation than their male peers.

29.     For instance, female colleagues disclosed to Ms. Osborne that they had been subject to grossly inappropriate comments, and the head of one group was commonly known to openly leer at female employees.

30.    Ms. Osborne herself experienced such grossly inappropriate and demeaning behavior as male colleagues ogled her body and spread malicious rumours about her, conduct to which similarly-situated men were not subjected.

31.    On another occasion, Ms. Osborne was told that she would not be allowed to take her children into the office; however Moody's offered male employees the privilege to do so.

32.    Further, a pregnant employee within the CMBS group was subject to discriminatory comments that called into question her commitment to her job after giving birth, with the Company blatantly confirming its adherence to common, unfounded stereotypes of women becoming less dedicated to their professional careers after starting a family.

33.    Throughout her time at the Company, Ms. Osborne was proactive in proposing many solutions to address the institutional problem of gender discrimination at Moody's; however, the Company's lack of interest to the solutions proposed by her and other female colleagues made it evident to Ms. Osborne that the Company had no real intention of addressing the discriminatory barriers placed before its female employees.

34.    Instead, the Company's largely male leadership took active steps to further propagate an environment where the careers of its female employees were made subordinate to those of their male counterparts.

35.    By way of example only, Ms. Osborne was told by her direct supervisor, Michael Gerdes, Managing Director of CMBS, that she needed to stop "excelling" in her role, because her outstanding performance was building "resentment" among her peers, all of whom were male.

36.    Ms. Osborne was also repeatedly denied opportunities and promotions that were provided to her male employees, even junior Analysts, again confirming that Moody's values the

career progression of male employees more highly than top performing female employees, such as Ms. Osborne.

37.     Moreover, despite a consistently strong performance record including outstanding performance reviews, Ms. Osborne was systematically denied promotions by the Company, while less qualified male colleagues were selected for promotion over her.

38.     Incredibly, prior to taking maternity leave, Ms. Osborne was told by her then supervisor, Jim Duca, that she would not be offered a promotion because he feared being "embarrassed" if Ms. Osborne then decided to stay with her family and not return from maternity leave, once again demonstrating how readily Moody's accepted stereotypes concerning the lack of commitment from working mothers, a stereotype that male employees simply did not encounter.

39.     Evenwhen Ms. Osborne eventually received a promotion to Senior Vice President, she was forced to wait over a year after Moody's promoted a less qualified male colleague to the same position.

40.     Despite Ms. Osborne having similar duties, and, in fact, more managerial responsibilities and experience than her male coworker, Moody's inexplicably chose him for a promotion while refusing to offer the same opportunity to Ms. Osborne; once demonstrating the difficulty encountered by female employees trying to advance into senior positions at the Company.

41.     In fact, rather than offering Ms. Osborne the promotions to which she was so evidently entitled, Moody's outrageously requested that Ms. Osborne accept *a demotion* into a more administrative role, a position historically reserved for women that the Company was trying to sideline as a precursor to forcing their departure.

42.     By way of example only, the previous employee in the position was a woman, who subsequently left the Company because of the considerable diminution in her responsibilities.

43.     The allegations made by Ms. Osborne are not isolated incidents; rather, they reflect the systemic and pervasive culture of gender discrimination at the Company; women have either been pushed out of the Company, or been compelled to leave because they recognized that the inherent discrimination practices at the company would mean that ultimately their career would reach a dead end.

44.     The inherent culture of gender discrimination at Moody's is evidenced by the fact that there has been a steady decline in senior female employees within the Company's Structured Finance Group; such that at the time Ms. Osborne's employment was terminated, all but one Managing Director in the Structured Finance Group was a man.

**Ms. Osborne Complains about Illegal Activity at Moody's**

45.     Persistent gender discrimination was not the only unlawful conduct Ms. Osborne experienced during her employment with Moody's.  Instead, she was also retaliated against for raising complaints about unlawful activity that she and her team had uncovered at the Company.

46.     Specifically, in or around September 2014, Ms. Osborne's team discovered that Moody's had issued an Interest Only Bond ("the Bond") with an incorrect rating.

47.     The incorrect rating was not only in violation of the Company's established practices, but also constituted a violation of the Securities Exchange Act of 1934.

48.     Upon discovering the error, which she assumed had been a simple oversight by the CMBS team in New Issue, Ms. Osborne took immediate steps to rectify it as she was required to under the law.

49.     Specifically, Ms. Osborne brought the error to the direct attention of Senior Vice President in the New Issue CMBS team, Joe Baksic.

50.     When Ms. Osborne contacted Mr. Baksic to inform him of the error his team had made, she was shocked to learn that Mr. Baksic and his team were already aware that the Bond had been improperly rated, and had, in fact, been aware for **approximately one year**, during which time they had failed to take corrective action.

51.     Ms. Osborne was further appalled to learn that the New Issue CMBS team had no intention of correcting the error, as they did not want to risk delaying a deal they were in the midst of closing.

52.     To that end, rather than take immediate action to correct their mistake when Ms. Osborne brought it to their attention, as she expected they would, Mr. Baksic's team downplayed Ms. Osborne's concerns by telling her that since the Bond was rated lower than it should have been, there was no harm in allowing it to remain at that level.

53.     Ms. Osborne ignored these protests, recognizing that what the Company was requesting was illegal and amounted to fraud.

54.     Instead, in an effort to both save the Company from public embarrassment and to avoid exposing it to the legal repercussions which would undoubtedly ensue as a result of it being revealed that a deal was permitted to go forward with a knowingly incorrect rating attached to a bond, Ms. Osborne escalated her discovery to the Company's Credit Policy department.

55.     Subsequently, Ms. Osborne's complaint was investigated by both the Company's outside counsel and, more notably, the SEC.

56.     Ms. Osborne cooperated fully with both investigations, and was interviewed by the SEC on multiple occasions about both the incorrect rating and the failure of Moody's to engage in the proper procedural protocols to calculate ratings correctly, as required by the SEC.

57.     Specifically, Ms. Osborne informed the SEC, in the presence of Moody's counsel, that the New Issue CMBS team had violated SEC rules by failing to produce records of how they had calculated the initial incorrect rating.

58.     As a result of Ms. Osborne's dedication, and her team's hard work, Moody's was able to act quickly to publically acknowledge the error, and rectify the bond rating – an unprecedented admission by the Company's CMBS Group.

**Defendants' Unlawful Retaliation**

59.     Despite the efforts undertaken by Ms. Osborne to ensure that the error was rectified, thereby avoiding further potential SEC violations for the Company, Moody's responded by punishing Ms. Osborne for seeking to address the Company's SEC violations.

60.     Both Mr. Baksic and other employees within the New Issue CMBS Group were openly critical of Ms. Osborne's actions, to individuals both within and outside the Company.

61.     In fact, Mr. Baksic, Robb Platz, an Associate Managing Director in Structured Finance and Mr. Levidy all blamed Ms. Osborne's actions in escalating the error, for the CMBS team being denied a 2015 bonus as a result of their improper conduct.

62.     By way of example only, Mr. Levidy actually implied to other employees within the Company that Ms. Osborne had acted ***improperly*** in filing the error protocol, thereby creating a situation where his team was punished by Moody's.

63.     Ms. Osborne was first made aware of the disparaging comments during her annual review in January 2015, when Michael Gerdes, Managing Director of the CMBS

Surveillance Group, warned her that individuals within the group were blaming her for the analysts being denied their bonus, because she had attempted to rectify the fraud the Company had preferred to sweep under the rug.

64.     Such unfounded criticism made by a Managing Director at Moody's caused severe damage to Ms. Osborne's reputation, not only within the Company, but in the industry as whole.

65.     As a result of the foregoing, as well as the pervasive discrimination she experienced as a strong woman in a male dominated Company, Ms. Osborne contacted Moody's Associate General Counsel, Maral Kazanjian, in March 2015, seeking to address the issues and hoping to protect her career and reputation from further attacks simply because she was a woman who would not ignore her legal responsibilities.

66.     Rather than making an effort to assist Ms. Osborne, Ms. Kazanjian informed her that she was responsible for her own career and should therefore raise the issue directly with Mr. Levidy, once again demonstrating the Company's almost total disregard for the concerns and development of its female employees.

67.     Although concerned about approaching a Managing Director by herself to raise her concerns about the hostile work environment that he had played a central role in creating, Ms. Osborne realized that, since no one at Moody's would assist her, she had no choice but to speak to Mr. Levidy herself.

68.     On approaching Mr. Levidy, the Managing Director demonstrated his callous disregard for her complaints by actually laughing at Ms. Osborne's very legitimate concerns about the damage to her professional reputation, and dismissed them as nothing more than petty

paranoia, once again openly displaying a stereotyped view of overly sensitive women in the workplace.

69.     Notably however, Mr. Levidy did not deny that he had, in fact, blamed Ms. Osborne for his team being punished for its error, nor did he deny that he had subsequently spoken to others at the Company about his unfavorable feelings towards Ms. Osborne for following the error protocol.

**Moody's Unlawful Termination of Ms. Osborne**

70.     The escalating retaliatory action against Ms. Osborne, for both her complaints about gender discrimination and about the illegal conduct she sought to rectify, cumulated with her termination on November 13, 2015, despite a record of continuous outstanding performance over eleven years.

71.     When Ms. Osborne discovered that an opportunity was available to serve on the Board of Directors at Ethan Allen, a company not being rated by Moody's, she followed the appropriate procedures for notifying the Company of the opportunity, and requesting permission to engage in an outside business interest.

72.     This was Ms. Osborne's third outside business interest request; on two previous occasions Ms. Osborne had made similar requests to the Company to be allowed to engage in an outside employment opportunity.

73.     When making the two previous requests, Ms. Osborne explicitly followed Moody's established procedure for making such requests, the same procedures Ms. Osborne followed with respect to the Board position at Ethan Allen.

74.     The Company did not object to Ms. Osborne's first request in 2014, which was precisely the same as the request submitted for Ethan Allen in August 2015.

13

75.     When the Company did object to the second request made by Ms. Osborne in April 2015, Ms. Osborne respected this decision, and declined the offer to join the Board of Directors.

76.     Notably, Ms. Osborne faced no disciplinary action in this instance for following the established procedure for outside business interest requests.

77.     Moreover, in order to be as transparent as possible, and to avoid any suggestion that she was trying to hide something, Ms. Osborne submitted the request to serve on the Board of Directors for Ethan Allen through her Moody's email account, which she was aware was monitored by the Company.

78.     Despite Ms. Osborne following pre-established Company procedure, Moody's seized on her transparency, and informed her that the application to join the Board of Directors of Ethan Allen was a violation of company policy that warranted a termination for cause.

79.     Ms. Osborne's termination was without prior warning, and had no performance-based justification.

80.     No similarly-situated male employees were terminated for cause as a result of making a request for outside employment.

81.     The Company took retaliatory action against Ms. Osborne for her efforts to report, and thereby prevent, what she reasonably believed to be Defendants' violations of applicable securities regulations and laws, as well as for making a complaint to the Company's General Counsel, Ms. Kazanjian, about the ingrained gender based discrimination rampant within the Company.

82.    Moody's unlawful retaliation and otherwise unlawful conduct has caused Ms. Osborne to suffer severe emotional distress and mental anguish, as well as substantial economic damages and harm to her professional reputation and career progression.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Sarbanes-Oxley Act Violation)**
***(Against All Defendants)***

83.    Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

84.    As set forth above, Defendants violated the Sarbanes-Oxley Act of 2002, 18 U.S.C § 1514A, by taking adverse employment action against Ms. Osborne, including, but not limited to, termination, in retaliation for Ms. Osborne's lawful conduct in providing information, causing information to be provided, or otherwise assisting in investigations regarding conduct in violation of 18 U.S.C. §§ 1341, 1343, 1344 or 1348 and/or the rules or regulations of the SEC.

85.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of SOX, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Discrimination in Violation of the Title VII)**
***(Against Defendant Moody's)***

86.    Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

87.     Moody's has discriminated against Plaintiff on the basis of her gender in violation of Title VII by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate working conditions, unlawfully refusing to promote her because of her gender and terminating her employment.

88.     As a direct and proximate result of Moody's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

89.     As a direct and proximate result of Moody's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

90.     Moody's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Retaliation Under Title VII)**
**(Against Defendant Moody's)**

91.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

92.     Moody's retaliated against Plaintiff in violation of Title VII by, *inter alia*, denying her equal terms and conditions of employment, subjecting her to disparate working conditions, and terminating her employment.

93.     As a direct and proximate result of Moody's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

94.     As a direct and proximate result of Moody's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

95.     Moody's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
**(Against All Defendants)**

96.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

97.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate working conditions, unlawfully denying promotions because of her gender and terminating her employment.

98.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

99.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

100.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of NYSHRL  for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
**(Against All Defendants)**

101.      Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

102.     Defendants have retaliated against Plaintiff in violation of NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate

working conditions, unlawfully denying promotions because of her gender and terminating her employment.

103.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

104.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

105.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYSHRL for which Plaintiff is entitled to an award of punitive damage.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### (Against Defendant Levidy)

106.    Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

107.    Defendant Levidy directly participated in the discriminatory conduct perpetrated against Plaintiff, on the basis of her gender by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate working conditions, unlawfully denying promotions because of her gender and terminating her employment.

108.    At all relevant times, Defendant Levidy had the ability to control the terms and conditions of Plaintiff's employment, including, but not limited to, the power to terminate Plaintiff's employment.

109.    Defendant Levidy knowingly or recklessly aided and abetted the unlawful discrimination and/or retaliation against Plaintiff in violation of the NYSHRL, including, but not

limited to subjecting her to disparate terms and conditions of employment than those of the Company's male employees and ultimately terminating her employment.

110.     As a direct and proximate result of Defendant Levidy's misconduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

111.      As a direct and proximate result of Defendant Levidy's misconduct, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

112.     Defendant Levidy's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
**(Against All Defendants)**

113.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

114.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate working conditions, unlawfully denying promotion because of her because of her gender and terminating her employment.

115.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

116.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

117.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
**(Against All Defendants)**

118.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

119.     Defendants have retaliated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate working conditions, unlawfully denying promotion because of her because of her gender and terminating her employment.

120.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

121.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

122.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR AN NINTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
### (Against Defendant Levidy)

123.    Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

124.    Defendant Levidy directly participated in the discriminatory conduct perpetrated against Plaintiff on the basis of her gender in violation of NYCHRL, by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to disparate working conditions, unlawfully denying promotions because of her gender and terminating her employment.

125.    At all relevant times, Defendant Levidy had the ability to control the terms and conditions of Plaintiff's employment, including, but not limited to, the power to terminate Plaintiff's employment.

126.    Defendant Levidy knowingly or recklessly aided and abetted the unlawful discrimination and/or retaliation against Plaintiff in violation of the NYCHRL, including, but not limited to subjecting her to disparate terms and conditions of employment than those of the Company's male employees and ultimately terminating her employment.

127.    As a direct and proximate result of Defendant Levidy's misconduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income for which she is entitled to an award of damages.

128.     As a direct and proximate result of Defendant Levidy's misconduct, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

129.     Defendant Levidy's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A TENTH CAUSE OF ACTION**
**(Dodd-Frank Act Whistleblower Retaliation Claim)**
**(Against All Defendants)**

130.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

131.     Plaintiff reasonably believed that Defendants were engaging in conduct that was in violation of various federal compliance requirements (including those administered and enforced by the Federal Reserve and SEC), Moody's and FINRA rules and policies, the Dodd-Frank Act and U.S. securities laws.

132.     Plaintiff's beliefs were reasonable and she acted in good faith.

133.     Plaintiff utilized internal and external reporting procedures, including informing the SEC of Defendants' misconduct.

134.     Plaintiff was a whistleblower within the meaning of § 922 of Dodd-Frank, or otherwise is afforded the protection of the anti-retaliation provisions of that statute.

135.     Plaintiff engaged in "protected conduct" within the meaning of § 922 of the Dodd-Frank Act.

136.     Defendants took adverse action against Plaintiff's employment in retaliation for Plaintiff's protected conduct which Defemdants would not otherwise have taken against her, including by virtue of terminating her employment.

137.     Plaintiff has been harmed by reason of Defendants' unlawful conduct and has suffered losses and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An injunction and order permanently restraining the Defendants from engaging in such unlawful conduct;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress, mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and loss of reputation;

E.      An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of Plaintiff's reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: March 13, 2017
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Douglas H. Wigdor
Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*